**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JOHN DOE

    *Plaintiff,*

-vs-

THE SUPREME COURT OF OHIO, ET AL.,

    *Defendants.*

CASE NO. 2:25 CV 0773

**JUDGE MARBLEY**
**MAGISTRATE JUDGE DEAVERS**

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

Plaintiff now moves this Honorable Court, in accordance with Fed. R. Civ. P. 65(a), 65(b), to grant a Temporary Restraining Order, followed by a Preliminary Injunction as set out below and for the reasons set out in the accompanying *Verified Memorandum* and *Verified Complaint* for Declaratory and Injunctive Relief.

As set out more fully in this *Verified Memorandum* and *Verified Complaint*, Plaintiff challenges the constitutionality of **Rule I Section 1(E)** of the Supreme Court of Ohio's Rules for the Government of the Bar of Ohio[1] (the "Bar Exam Requirement") as applied to the general requirements for Ohio Bar admission given that the Rule contains standards that produce a disparate impact on a "suspect class" and are not sufficiently performance related, the Defendants' continued use of the Rule's standards in the face of cautions against the Rule's disparate impact exhibits a pattern or practice of discrimination, and in effect, the Rules continued use exhibits intentional discrimination, inter alia. *Ricci v. Destefano*, 557 U.S. 557, 578, 174 L.Ed.2d 490, 129 S.Ct. 2658, 77 USLW 4639 also see *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 1856 52 L.Ed.2d 396 (1977).

---

[1] *Available* at https://www.supremecourt.ohio.gov/docs/LegalResources/rules/govbar/govbar.pdf

**Verified**

The plaintiff also intends to show that the Supreme Court of Ohio Defendants adopted current Rule I Section 1(E) licensing standards in violation of constitutional protections and have refused to adopt available alternative, less discriminatory practices in evaluating and admitting competent African Americans to the Ohio Bar. *Id.*

Plaintiff submits that she meets the standards for a Temporary Restraining Order and a Preliminary Injunction. She has probable success on the merits, Plaintiff faces immediate and irreparable harm, others will not be substantially harmed, the public interest will be served, and there is no adequate remedy at law.

Because a Temporary Restraining Order and Preliminary Injunction present no monetary risks to the Defendants, Plaintiff requests that bond be set at $1. Fed. R. Civ. P. 65(c); Local Rule of Civil Procedure 67.1.

For the reasons stated in the accompanying *Verified Memorandum* and *Verified Complaint*, Plaintiff prays that this Court grants this *Motion* and temporarily restrain and preliminarily enjoin the Defendants from enforcing the challenged provisions as applied until a final hearing on the merits.

Pursuant to Local Rule of Civil Procedure 7.1(b)(2) oral argument is requested on this Motion because of the complex legal arguments involved in this case.

Respectfully submitted,

JOHN DOE

/s/

John Doe *Pro-Se Plaintiff*
6908 Willow Bloom Dr.
Canal Winchester, OH, 43110
Phone: 216-525-9982
Email: dbsmith135@gmail.com

**Verified**                    2

<u>**MEMORANDUM IN SUPPORT**</u>

## INTRODUCTION

Standardized employment tests have often been declared unconstitutional when a Plaintiff shows that the challenged test engenders a disparate impact on a "suspect class" and fails to sufficiently measure a test taker's employment performance capability. Courts have often reached this conclusion when an employment test is used to measure a test taker's employment performance capability by merely evaluating how well the test taker applies discrete knowledge to discrete problems when in reality, the test taker's employment performance capability would be better measured by determining how well the test taker applies prior knowledge, insight, and wisdom of the job to deal with fluid, on the job, problems that have never been seen before, or contemplated in the mind of a test examiner.

Plaintiff's request for Declaratory and Injunctive Relief rests, in part, on this premise.

Plaintiff submits that Rule I Section 1(E)'s Uniform Bar Exam (UBE) testing requirement, is incapable of sufficiently measuring a Bar Candidate's competence to practice entry-level law and therefore Rule I Section 1(E)'s UBE testing requirement fails to meet Title VII's "job-relatedness" standards.

Statistics show that, since Ohio began administering the UBE licensing test in 2020, the exam has engendered racial disparities that have substantially impacted African Americans' ability to gain full access to employment as licensed attorneys in Ohio as well as nationally. *see* Plaintiff's

**Verified**                                    3

Exhibit 1 *Ohio Supreme Court Adopts Uniform Bar Examination*;[2] Plaintiff's Exhibits 2[3], 3[4] *ABA Summary Bar Pass Data "FT" 2020, 2021, 2022, 2023.*

Ohio's first African American attorney was admitted to the Bar in 1854. Credited with being the first African American to apply to an American law school, John Mercer Langston[5] was denied law school admission in New York and Ohio, due to race. Undeterred by the racial opposition to his admittance, Langston would go on to study law under abolitionist attorney Philemon Bliss before receiving his Ohio law license. It must be noted that Langston was never subjected to a Bar Exam.

Since Langston's law school denial in the 1850s, minority law school enrollment has nearly tripled over the past 30 thirty years. *see* Plaintiff's Exhibit 4 *American Bar Association Total Minority J.D. Enrolment Data*[6] and Plaintiff's Exhibit 5 *Enjuris Law School Enrollment Data.*[7]

Despite continual increases in African American law school enrollment, Ohio's African American Bar membership has remained near 4% four percent, while nationally, African American Bar membership has remained near 5% five percent. *see* Plaintiff's Exhibit 6 *Justice Speeches Law & Leadership Institute Faculty "Chief Justice Eric Brown;"*[8] Plaintiff's Exhibits 7, 8, 9, 10, 11

---

[2] *Available* at https://www.courtnewsohio.gov/happening/2018/UBE_081418.asp
[3] *Available* at
https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/statistics/2023/2023-bpq-national-summary-data-race-ethnicity-gender.pdf
[4] *Available* at
https://www.americanbar.org/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/statistics/2024/summary-race-ethnicity-gender.pdf
[5] *Available* at https://history.house.gov/People/Detail/16682
[6] *Available* at https://arc.accesslex.org/ds-enrollment/5/
[7] *Available* at https://www.enjuris.com/students/law-school-race-2022/
[8] *Available* at https://www.supremecourt.ohio.gov/courts/judicial-system/supreme-court-of-ohio/justice-speeches/eric-brown/law--leadership-institute-faculty

**Verified** 4

*Profile of the Legal Profession in Ohio 2019*[9], *2020*[10], *2021*[11], *2022*[12], *2023*;[13] also see Plaintiff's Exhibit 12 *Lawyer Population is up 6.6% in 10 years; percent of Black lawyer remains the same, new ABA survey says*;[14] and Plaintiff's Exhibit 13 *A History of African American, Latino, and American Indian Law School Admissions* at pg. 40-42.[15]

The aforementioned statistics are most disconcerting, as they relate to the present claim, because as a result of the UBE licensing exam over the past 4 years, on average, 39.5% thirty-nine-point five percent of first-time African American Bar Candidates failed the exam and were barred from gaining full employment as licensed attorneys, in the state in which the UBE was taken, while only 15% fifteen percent of first-time White Candidates failed and were barred from gaining employment as licensed attorneys during the same period. *see* Plaintiff's Exhibits 2, 3 *ABA Summary Bar Pass Data "FT" 2020, 2021, 2022, 2023.*

Just as the tests implemented by Duke Power Company were declared unconstitutional because of the barriers they engendered against African Americans' ability to access desired employment within the power company *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and the barriers imposed by Ironworkers Local 86 were declared unconstitutional because of the impact they had on African American's ability to gain access to employment within Seattle's construction industry *United States v. Ironworkers Local 86*, 443 F.2d

---

[9] *Available* at https://www.ohiobar.org/globalassets/public-resources/profile-of-legal-profession/pdfs/polp-public-may2020.pdf
[10] *Available* at https://www.ohiobar.org/globalassets/public-resources/profile-of-legal-profession/pdfs/polp_public_2020.pdf
[11] *Available* at https://www.ohiobar.org/globalassets/public-resources/profile-of-legal-profession/pdfs/polp_public_2021.pdf
[12] *Available* at https://www.ohiobar.org/globalassets/public-resources/profile-of-legal-profession/pdfs/polp_public_2022.pdf
[13] *Available* at https://www.ohiobar.org/globalassets/public-resources/profile-of-legal-profession/pdfs/polp_public_2023.pdf
[14] *Available* at https://www.abajournal.com/web/article/lawyer-population-is-up-6.6-in-10-years-percentage-of-black-lawyers-remains-the-same
[15] Available at https://journals.law.harvard.edu/wp-content/uploads/sites/92/2016/10/19-JREJ-1.pdf

**Verified**                                              5

544 (1971), and the practice of the Columbus Division of Police were declared unconstitutional in *Police Officers for Equal Rights v. CITY OF COL.*, 644 F. Supp. 393 (1985), Rule I Section 1(E) licensing standards should also be declared unconstitutional.

The Sixth Circuit recently upheld an injunction against a "governmental organization" whose testing standards were ultimately deemed discriminatory based on disparate impact. *Howe v. City of Akron*, 801 F.3d 718 (2015).

In *Howe*, the Defendants used an exam that had been developed and scored by a third party who claimed to identify competent candidates/applicants who would, in turn, receive referrals for senior positions in the fire department based on the outcome of their test scores. *Id* at 724. The outcome of the *Howe* Defendants' tests led to a disproportionate number of White candidates' referrals over African American candidates.

It was further determined that the exam **did not** sufficiently measure an applicant's ability to competently execute the role for which the test was administered. *Id* at 727.

The *Howe* court found that "Where racial discrimination is found, 'the (district) court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Id* citing *Isabel v. City of Memphis*, 404 F.3d 404, 414, (6th Cir.2005).

Just like the tests administered in *Howe*, the Supreme Court of Ohio Defendants contract with the National Conference of Bar Examiners (NCBE) to develop and score the UBE licensing exam. The exam claims to identify competent Ohio Bar Candidates who, in turn, gain licensing referrals and bar licenses from the Board of Law Examiners and the Supreme Court of Ohio respectively, based on the outcome of test scores.

Plaintiff now submits that Rule I Section 1(E)'s UBE licensing standards have created a disparate impact on a "suspect class," are arbitrarily calculated, the test is not an indicator of a Bar Candidate's ability to practice entry-level law, the exam is an added employment barrier to the licensed legal profession without reasonable alternatives and has been unequally applied to otherwise qualified individuals who seek to practice Ohio Law.

Consequently, Plaintiff prays for Declaratory and Injunctive Relief from this lingering employment entrance device which continues to foster a racially stratified Bar.

## FACTS

Between 1987 and 1988, total minority law school enrollment across the country stood at just 13,250. By 2012-2013, minority total enrollment grew to over 35,914. *Id.* As of 2022, the total number of minorities enrolled in law school has reached 38, 576. *see* Plaintiff's Exhibit 4 *American Bar Association Total Minority J.D. Enrolment Data*; Plaintiff's Exhibit 5 *Enjuris Law School Enrollment Data*; Plaintiff's Exhibit 13 *A History of African American, Latino, and American Indian Law School Admissions* at pg. 40-42.

During this period, Ohio has also experienced a steady increase in African American law school enrollments.[16]

Despite steady increases in African American law school enrollment, Ohio's African American Bar membership has remained near 4% four percent, while first-time African American Bar candidates **fail** the UBE Bar licensing exam at an average rate of 39.5% thirty-nine-point five percent, while first-time White candidates **fail** at an average rate of 15% fifteen percent. *see* Plaintiff's Exhibit 6 *Justice Speeches Law & Leadership Institute Faculty "Chief Justice Eric*

---

[16] To establish a prima-facie case for disparate impact there is no requirement that a statistical showing of disproportionate impact must always be based on the analysis of the characteristics of the actual applicants. *see Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) citing *Griggs v. Duke Power Co.*, supra, 401 U.S., at 430, 91 S.Ct., at 853.

**Verified**                                             7

*Brown*;" also see Plaintiff's Exhibits 7, 8, 9, 10, 11 *Profile of the Legal Profession in Ohio 2019, 2020, 2021, 2022, 2023*; Plaintiff's Exhibits 2, 3 *ABA Summary Bar Pass Data "FT" 2020, 2021, 2022, 2023;* Plaintiff's Exhibits 12 *Lawyer Population is up 6.6% in 10 years*; *percent of Black lawyer remains the same, new ABA survey says.*

In a 2010 speech given by then Ohio Supreme Court Chief Justice Eric Brown[17] addressing diversity in the legal community, inter alia, the Chief Justice indicated that African Americans represented merely 3.7% three-point-seven percent of Ohio's registered attorneys in 2010. *see* Plaintiff's Exhibit 6 *Justice Speeches Law & Leadership Institute Faculty "Chief Justice Eric Brown*. During his speech, the Chief Justice opined about this statistic indicating that, "generations of minority children have been told either that the legal profession is off limits to them, or they were never introduced to the possibility of a career in the law." *Id.*

The Chief Justice's recognition elucidates only a fraction of the systemic disparities faced by African Americans who seek to enter the legal profession as licensed attorneys. These, as well as other racial disparities facing African American legal professionals are outlined in a study conducted by the Ohio Commission on Racial Fairness (OCRF).

In 1993, the Supreme Court of Ohio, in conjunction with the Ohio State Bar Association, established the OCRF to study racial bias in Ohio's legal system. *see* Plaintiff's Exhibit 14 *Ohio Commission on Racial Fairness* at Introduction.[18] The Supreme Court of Ohio tasked the OCRF with identifying, "racial bias" in Ohio's legal system with the intent to develop and propose "methods for eliminating it from the legal profession and the justice system." *Id.*

---

[17] Chief Justice Eric Brown*'s Bio available* at https://www.supremecourt.ohio.gov/courts/judicial-system/supreme-court-of-ohio/justices-1803-to-present/eric-brown/
[18] *Available* at https://www.supremecourt.ohio.gov/docs/Publications/fairness/fairness.pdf

Upon receiving its commission, the OCRF analyzed racial bias in Ohio's legal system for over 6 six years. *Id* at pg. 2-5. The Commission held over 10 public hearings, spoke with countless lawyers and judges, and convened several task forces to study different approaches to tackle the issue of perceived and actual racial bias in Ohio's legal system. *Id*. In 1999, the OCRF released its findings in a 94 ninety-four-page report. *Id*.

One major issue addressed by the OCRF was Ohio's "lack of minority representation on the bench and bar." *Id* at 11. The Commission described the Ohio public's lack of access to minority lawyers as a "disturbing trend" that needed to be addressed in order to curb the trend of perceived and actual racial inequity in Ohio's legal system. *Id* at pg. 10-11; also *see* Plaintiff's Exhibit 15 *Focus on Diversity: Why Diversity Must Matter to the Bar Admission Community*.[19]

In response to the aforementioned finding, OCRF Commissioners agreed that "increasing minority representation is a goal for which the entire legal system must continue to strive." *Id*.

In 2000, the Supreme Court of Ohio subsequently commissioned the Racial Fairness Implementation Task Force (RFITF) to implement OCRF's findings and to develop additional recommendations that would further move Ohio toward a more equitable legal system. *see* Plaintiff's Exhibit 16 *Racial Fairness Implementation Task Force "Action Plan"* at Introduction.[20]

After studying the issues raised in OCRF's report, for an additional two years, the RFITF released a report in 2002 that insisted that the Supreme Court of Ohio "collect racial and ethnic information on bar examination candidates and monitor the results for race-based discrepancies."

---

[19] *Available* at https://thebarexaminer.ncbex.org/article/fall-2020/why-diversity-must-matter-to-the-bar-admissions-community/

[20] *Available* at https://www.supremecourt.ohio.gov/docs/Publications/fairness/Action-Plan-dev.pdf

Presumably, the RFITF reached this conclusion as a means of addressing Ohio's lack of access to African American and minority lawyers. *Id* at 51.

But before adopting the challenged Rule I Section 1(E) licensing standards that are at issue in this case, the Supreme Court of Ohio Defendants failed to adhere to the OCRF's and the RFITF's recommendations in addressing Ohio's lack of access to African American and minority lawyers.

Upon commissioning the Ohio Bar Examination Report and Recommendations Task Force in 2017, a task force that was commissioned to study the impact the newly adopted UBE licensing standards would have on Ohio Bar admissions, *see* Plaintiff's Exhibit 17 *Task Force on the Ohio Bar Examination[21] at* pg. 1, the Task Force extensively studied "gender-related" disparate impact caused by the newly adopted licensing standards, *Id* at 13, however, this Task Force failed to study the extent to which the licensing standards would cause disparate impact on African Americans in the manner in which it studied "gender-related" disparate impact caused by the new standards. *Id* at 10-15.

As of 2023, American Bar Association (ABA) data indicates that African Americans are now 26.4% twenty-six-point four percent **less likely**, than their White counterparts, to be admitted to the Bar, in the state in which the exam has been taken, under current Rule I Section 1(E) UBE standards, while around 43% forty-three percent of African American first-time UBE takers **fail** the exam. *see* Plaintiff's Exhibits 2, 3 *ABA Summary Bar Pass Data "FT" 2020, 2021, 2022, 2023.*

Plaintiff is of African American descent. She possesses an undergraduate degree and a law degree from accredited Ohio universities. Upon graduating from law school, Plaintiff enrolled in a

---

[21] *Available* at https://www.supremecourt.ohio.gov/docs/Publications/barExamTF/Report.pdf

Barbari test prep course and immersed herself in preparing for Ohio's UBE licensing exam. *see* Plaintiff's Exhibit 18 *Barbari Course Completion Rate*. On average, Plaintiff spent around nine and a half hours, a day, preparing for the bar exam. *Id.*

Plaintiff routinely attended essay study groups with fellow bar examiners, and she spent approximately 20 hours over the phone and via video messaging studying with fellow bar examiners discussing the best approaches to master each subject on the exam.

Plaintiff, paid for, and took Ohio's July 2023, February 2024, and July 2024 UBE licensing exams. *see* Plaintiff's Exhibits 19, 20 *Ohio Bar Examination Result Letter July 2023, 2024*. Yet in each instance, the Board of Law Examiners deemed Plaintiff not competent to practice Ohio Law. *see* Plaintiff's Exhibits 21, 22 *Ohio Bar Examination Score Report July 2023, 2024*.

Rule I Section 1(E) licensing standards dictate that a Candidate's competence, to practice entry-level Ohio Law, rests solely on achieving a 270 UBE score. Wisconsin, on the other hand, bases a Candidate's competence on the Candidate's ability to successfully navigate the rigors of an accredited Wisconsin law school. *see* Plaintiff's Exhibit 23 *SCR Chapter 40 Admission to the Bar*.[22]

And while 22 twenty-two other state jurisdictions base a Candidate's competence on achieving a UBE score lower than Ohio's 270 score, the states of Arizona and Oregon have developed alternative approaches to establishing a Candidate's competence which further alleviates the disparate impact of the standardized UBE exam. *see* Plaintiff's Exhibit 24 *UBE Exam Score Range;*[23] also see Plaintiff's Exhibit 25 *Addressing the Access-to-Justice Gap: A persistent Challenge That Calls for Multiple Approaches*. Fall 2024 (Vol. 93, No. 3), pp. 6–19;[24] and Plaintiff's Exhibit 26 *The Oregon Supervised Practice Portfolio Examination*.[25]

---

[22] *Available* at https://www.wicourts.gov/sc/rules/chap40.pdf
[23] *Available* at https://www.ncbex.org/exams/ube/ube-minimum-scores
[24] *Available* at https://thebarexaminer.ncbex.org/article/fall-2024/addressing-the-access-to-justice-gap/
[25] *Available* at https://www.osbar.org/_docs/rulesregs/SPPERules.pdf

**Verified**                                          11

The Arizona Supreme Court has recently unveiled the Arizona Lawyer Apprentice Program (ALAP). The ALAP creates an alternative pathway to licensing by allowing candidates/applicants whose exam score lands between 260 and 269 to practice law under the supervision of a qualified Arizona attorney and upon successful completion of a two-year period, ALAP practitioners are fully admitted to practice law in Arizona without having to retake the bar exam. *see* Plaintiff's Exhibit 25 *Addressing the Access-to-Justice Gap: A persistent Challenge That Calls for Multiple Approaches*. Fall 2024 (Vol. 93, No. 3), pp. 6–19.

The Oregon Supreme Court has in turn developed the Supervised Practice Portfolio Examination. *see* Plaintiff's Exhibit 26 *The Oregon Supervised Practice Portfolio Examination*. This program permits Oregon Bar Candidates to gain a law license after successfully completing 675 hours supervised by an attorney, leading 2 client interviews, and submitting 8 writing samples for review. No Bar Exam is required under this program.

At the time of Plaintiff's filing, Plaintiff has not been admitted to the Ohio Bar and is scheduled to take Ohio's July 2025 UBE licensing exam scheduled for July 28, 2025.

But-for the challenged Rule I Section 1(E) 270 UBE licensing standard, Plaintiff would otherwise be eligible and is qualified to practice Ohio Law.

## LAW AND ARGUMENT

The granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court. *Virginia Railway Co. v. System Federation, R.E.D.,* 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937); *Brandeis Machinery & Supply Corp. v. Barber-Greene Co.,* 503 F.2d 503 (6th Cir. 1974).

In determining whether to grant a preliminary injunction a district court must balance four factors: '(1) whether the movant has a strong likelihood of success on the merits;

**Verified** 12

(2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.' *Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)).

"These factors are not prerequisites but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). However, "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for America v. Husted,* 697 F.3d 423, 436 (6th Cir.2012) (quoting *Jones v. Caruso,* 569 F.3d 258, 265 (6th Cir.2009)).

The factors to be considered in determining whether a court should issue a Temporary Restraining Order are the same factors that are considered in granting a preliminary injunction. *Summit County Democratic Cent. and Executive Comm. v. Blackwell*, 388 F.3d 547, 550-551 (6th Cir.2004).

## LIKELIHOOD OF SUCCESS ON THE MERITS

To establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success. *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 n. 4 (6th Cir.1977).

A claim may likely succeed on the merits if the claim raises questions that go to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985).

A Plaintiff may also meet this preliminary burden "when the nature of the questions which arise upon a suit make them a proper subject for deliberate examination." *Id.*

## A. TITLE VII DISPARATE-IMPACT CLAIM

Though Title VII, disparate-impact claims originated with the Supreme Court's decision in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), Congress codified the disparate-impact standard in the Civil Rights Act of 1991. *see* 42 U.S.C. § 2000e–2(k)(1); *Ricci v. DeStefano,* 557 U.S. 557, 577–78, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009).

While *Griggs* explicitly focused on employment[26] "practices, procedures, or tests," 401 U.S., at 430, 91 S.Ct., at 853, that deny equal employment "opportunity," *id.*, at 431, 91 S.Ct., at 853., Title VII prohibits "procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups" *Id.*, at 432, 91 S.Ct., at 854, irrespective of an employer's intent. *Id.*

In employment discrimination lawsuits under Title VII of the Civil Rights Act, courts require minimal prima facie showing by a complainant. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Courts assess the viability of these claims using a three-step burden-shifting framework.

> [First,] a plaintiff establishes a prima facie violation by showing that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(k)(1)(A)(i). [Second, the] employer may defend against liability by demonstrating that the practice is "job related for the position in question and consistent with business necessity." *Ibid.* [Third,] ... if the employer meets that burden, ... [the] plaintiff may still succeed by showing that the employer refuses

---

[26] 42 U.S.C. § 2000e et seq defined "employer" as a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person. A liberal construction of the *Griggs v. Duke Power Co.,* holding has expanded the general understanding of the term "employer" to include individuals who do not stand in a direct employment relationship with an employer as outlined in *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338 and *The Assoc. of Mexican Am. Educators v. State of California,* 231 F.3d 572. Plaintiff intends to further address this issue in her Motion for Summary Judgment.

to adopt an available alternative that has less disparate impact and serves the employer's legitimate needs. §§ 2000e–2(k)(1)(A)(ii) and (C).

*Ricci*, 557 U.S. at 578, 129 S.Ct. 2658; *see also Davis v. Cintas Corp.*, 717 F.3d 476, 494–95 (6th Cir.2013).

The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices that have fostered racially stratified job environments to the disadvantage of minority citizens. *McDonnell v. Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973).

Furthermore, Title VII does not require a formal employment relationship between the Plaintiff and the Defendant. *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 875 (6th Cir. 1991). Plaintiffs are protected under Title VII if the defendant is one "who significantly affects access of any individual to employment opportunities." *Id.*

**a. Rule I Section 1(E), particularly the Board of Law Examiners' UBE testing requirements, have led to disparate impact on a "suspect class."**

In examining a claim for relief under Title VII, a court's inquiry must focus on those employment practices which gave rise to the particular complaint. *see United States v. International Brotherhood of Electrical Workers, Local 38,* 428 F.2d 144 (6th Cir. 1970); *Jenkins v. United Gas Corporation,* 400 F.2d 28, 33 (5th Cir. 1968); *United States v. Plumbers Local 73,* 314 F.Supp. 160 (S.D.Ind.1969).

Courts should accord Title VII a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness, and humiliation of racial discrimination. *see United States v. Medical Society of South Carolina*, 298 F.Supp. 145, 151, 152, (D.S.C. 1969) *citing Hamm v. City of Rock Hill*, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964).

**Verified** 15

Since the passage of the Civil Rights Act of 1964, courts have frequently relied upon statistical evidence to prove a violation of the employment discrimination laws. *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (9th Cir.1971). This judicial practice has most often taken the form of the use of such data as a basis for allocating the burden of proof. *Id.*

There is no requirement, however, that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants. *Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). The application process might itself not adequately reflect the actual potential applicant pool. *Id.*

Therefore, facially neutral employment practices that have significant adverse effects on protected *groups* have been held to violate Title VII without proof that the employer adopted those practices with a discriminatory intent. *Griggs* at 432.

As a matter of law, without other supportive evidence, statistics showing an extraordinarily small number of blacks in an industry may be sufficient grounds to imply discrimination. *Parham* at 425.

Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) *citing Teamsters*, supra, 431 U.S. at 339, 97 S.Ct., at 1856.

In the present case this court should conclude that Rule I Section 1(E) has engendered a disparate impact on a "suspect class," because the Rule contains a licensing standard that has led to a substantially disproportionate number of African American Bar Candidates receiving licensing referrals as related to their White counterparts, in both Ohio as well as nationally.

**Verified**                                    16

As expressed in this *Verified Memorandum* and *Verified Complaint*, African Americans make up roughly 14% fourteen percent of Ohio's overall population, 43% forty-three percent of its prison population, 34% thirty-four percent of its jail population, and yet as of 2023, African Americans only make up 4% four percent of Ohio's Bar membership. *see* Plaintiff's Exhibit 27 *Prison Policy Initiative Ohio Profile*[27] and Plaintiff's Exhibit 28 *Ohio Department of Development Ohio African Americans "Snapshot from the 2022 American Community Survey.*[28]

On the other hand, Ohio's White population makes up 80% eighty percent of Ohio residences while accounting for nearly 83% eighty-three percent of Ohio's Bar membership. *see* Plaintiff's Exhibits 7, 8, 9, 10, 11 *Profile of the Legal Profession in Ohio 2019, 2020, 2021, 2022, 2023.*

According to ABA data for 2023, first-time African American UBE exam takers **failed** the UBE at a rate of 42% forty-two percent, while first-time White takers **failed** at a rate of 16% sixteen percent. *see* Plaintiff's Exhibits 2, 3 *ABA Summary Bar Pass Data "FT" 2020, 2021, 2022, 2023.*

In 2022, first-time African American test takers **failed** the exam at a rate of 43% forty-three percent, while first-time White test takers **failed** at a rate of 17% seventeen percent. *Id.*

In 2021 first-time African American test takers **failed** the exam at a rate of 39% thirty-nine percent, while first-time Whites test takers **failed** at a rate of 15% fifteen percent. *Id.*

In 2020 first-time African American test takers **failed** the exam at a rate of 34% thirty-four percent, while first-time White test takers **failed** at a rate of 12% twelve percent. *Id.*

---

[27] *Available* at https://www.prisonpolicy.org/profiles/OH.html
[28] *Available* at https://dam.assets.ohio.gov/image/upload/development.ohio.gov/research/Ohio-African-American-Population-2022.pdf

**Verified**

As a result of the above-cited statistics, each African American Bar Candidate who failed the licensing exam did not receive a recommendation for Bar licensing, in the state in which the test was taken, and was otherwise unable to gain full employment as a licensed attorney at the time tests results were released.

Plaintiff submits that the above-listed data exhibits circumstantial evidence for a prima facie showing of Rule I Section 1(E)'s disparate impact on African American test takers.

Plaintiff further submits that the 2018 findings of the "*Task Force on the Ohio Bar Examination*" presents direct evidence of the Supreme Court of Ohio Defendants' knowledge of Rule I Section 1(E)'s potential for disparate impact. *see* Plaintiff's Exhibit 17 *Task Force on the Ohio Bar Examination* at 10-15.

The *Task Force on the Ohio Bar Examination* articulated the exam's potential for disparate impact in a 2018 report which was commissioned to evaluate Ohio's adoption of the current licensing standards. *Id* at 10."

The report's authors cautioned the Supreme Court of Ohio Defendants of the potential disparate impact of adopting the exam, labeling potential disparate impact on African Americans a, "disadvantage" and a "concern" upon the bar passage rates of distinct demographic groups, in particular, women and racial minorities." *Id.*

While the findings of this report contain only a vague articulation of the scope of disparate impact, the report's conclusion outlines the Supreme Court of Ohio Defendants' direct knowledge of the exam's potential for disparate impact on African Americans, before the new Rule I Section 1(E) licensing standards were adopted.

And by all estimates, the exam has caused a disparate impact on African American Bar Candidates.

**Verified**                    18

While Ohio, as well as many other jurisdictions across the country, continues to take strides at eliminating racial inequality in the makeup of our nation's justice system, the present claim does not seek to diminish the efforts of those countless individuals who have labored to curb systemic legal inequality in Ohio's Bar makeup.

Plaintiff's Title VII claim merely seeks to address the disparate impact of current Rule I Section 1(E)'s UBE licensing standards in an effort to eradicate lingering discriminatory devices that have historically fostered a racially stratified Bar.

Taken together, this court should conclude that Plaintiff has provided sufficient evidence to establish a prima-facie showing of Rule I Section 1(E)'s disparate impact on African Americans' ability to gain full employment as licensed attorneys in Ohio as well as nationally.

**b. The UBE is not an indicator of a candidate's ability to perform as an attorney or necessary for the licensing of competent attorneys.**

Once a plaintiff has established a prima-facie case of discrimination, the burden shifts to the employer to justify the challenged selection device as a business necessity by showing that it is significantly job-related. *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs,* 401 U.S., at 431, 91 S.Ct., at 853.

The major task in establishing the "job relatedness" factor is a showing of a substantial relationship between test results and job performance. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

A test fashioned from materials pertaining to the job superficially may seem job-related. *Id* at 426. But the ultimate issue in gauging "job relatedness" is whether a test demonstrably selects people who will perform better, the required on-the-job behaviors, after they have been

hired and trained. *Id*. The crucial fit is not between test and job lexicon, but between the test and job performance. *Id*.

Furthermore, an employer's burden of justifying an employment practice that produces a disparate impact is not lessened simply because the practice relies upon subjective assessments. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 101 L.Ed.2d 827, 108 S.Ct. 2777, n. (b) (1988).

Establishing a general rule allowing an employer to escape liability simply by articulating vague, inoffensive-sounding subjective criteria would disserve Title VII's goal of eradicating employment discrimination by encouraging employers to abandon attempts to construct neutral selection mechanisms in favor of broad generalities. *Id* at 980.

While subjective criteria will sometimes pose difficult problems for courts charged with assessing job-relatedness, requiring the development of a greater factual record, and, perhaps, the exercise of a greater degree of judgment, that does not dictate that subjective-selection processes generally are to be accepted at face value. *Id*.

Employers seeking to determine through professional validation studies whether employment tests are job-related, such tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated. *Albemarle Paper Co*. at. 431 also see *Giggs* at 434.

Validation studies constitute '(t)he administrative interpretation of Title VII by the enforcing agency,' and consequently, they are 'entitled to great deference. *Id*. But ultimately, discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which

**Verified**                                      20

comprise or are relevant to the job or jobs for which candidates are being evaluated.' 29 CFR § 1607.5.(c). *Id.*

This court should conclude that Rule I Section 1(E)'s licensing standards are not a business necessity nor sufficiently job-related because the test is not an indicator of how well a Bar Candidate will perform as an attorney. The test merely evaluates how well Candidates have memorized legal information.

The Uniform Bar Exam, better known as the UBE, is prepared entirely by NCBE. The test consists of the Multistate Essay Examination (MEE), the Multistate Performance Test (MPT), and the Multistate Bar Examination (MBE), administered over two days.

The MEE consists of six 30-minute questions that require examinees to demonstrate effective writing. The MPT consists of two 90-minute writing tasks which also require examinees to demonstrate effective writing. The MBE is a six-hour, 200-question multiple-choice examination that tests legal knowledge.

While the NCBE grades the MBE portion of the exam, the Board of Law Examiners selects individual Ohio Bar Exam Graders to grade the MPT and MEE writing portions of the exam.

It goes without saying that most attorneys, in practice, will never be asked to perform the tasks they encounter on the UBE, in the fashion they are asked to perform them on the UBE.

In practice, the typical tax attorney will never be responsible for drafting or filing a written legal brief and moreover, the typical tax attorney will never be limited to 30 or 90 minutes to develop an answer to a legal question.

Most transactional and sports attorneys will never be responsible for using LexisNexis or Westlaw to conduct legal research in order to render a 90 minute legal conclusion.

**Verified** 21

While demonstrating effective writing is a major component of the UBE, (the MPT and MEE written portions of the UBE which are subjectively graded make up 50% fifty percent of a test taker's score), legal writing accounts for a modicum of an attorney's competence to practice entry-level law and not all competent attorneys are effective writers.

As for the exam's overall "job relatedness," the test, in its current form, is incapable of evaluating an applicant's ability to develop unique legal strategies based on unique fluid real-world facts, the exam fails at assessing a test taker's personality, it fails at evaluating a test taker's strength to conduct oral arguments, it fails at evaluating a test taker's ability to provide customer service, and it also fails at judging one's honesty and dedication to exact justice for clients on whose behalf the attorney represents.

All of the aforementioned characteristics make up an attorney's practical competence to practice entry-level law.

Over the past 90 ninety years Wisconsin's general public, as well as Bar Candidates who have obtained a law degree from an accredited Wisconsin law school, have enjoyed the privilege of having entry-level lawyers admitted to Wisconsin's Bar without examination under the Supreme Court of Wisconsin's "diploma privilege." *see* Plaintiff's Exhibit 29, *A History of The Organized Bar in Wisconsin* at pg. 35.[29]

The Supreme Court of Wisconsin adopted the "diploma privilege" as a means of establishing a universal standard for assessing entry-level legal competence after years of accepting an amalgamation of licensing approaches, which included written examinations. *Id* at 35-36. Faced with mounting pressure by the ABA, in 1955, to rescind the "diploma privilege" and institute a formal statewide Bar Exam, the Supreme Court of Wisconsin rejected the ABA's

---

[29] *Available* at https://www.wisbar.org/aboutus/overview/Documents/History-of-the-Bar.pdf

onslaught after Wisconsin's Bar Committee on "Legal Education and Bar Admissions"

concluded that bar examinations are an "unnecessary and undesirable process" *Id* at 36.

In a report published by the Wisconsin State Bar, that documented Wisconsin's retention

of the "diploma privilege," the Committee on "Legal Education and Bar Admissions'"

conclusion on this issue is described as rejecting the assertion of Bar Exam proponents that "the

real argument for a bar examination and the elimination of the diploma privilege must be a

conviction that the bar examination would winnow some people at the bottom of the scholastic

latter who are potentially unqualified to practice" *Id* at 36.

Wisconsin's State Bar is currently comprised of 20,022 active members. Wisconsin's

Office of Lawyer Regulation statistical data indicates that in Fiscal Year (FY) 2022-2023, only

5.5% five-point five percent of its active lawyers were subjected to new grievances. *see*

Plaintiff's Exhibit 30 *The Lawyer Regulation System Annual Statistical Report 2022-2023* at

Executive Summary.[30] While in FY 2023-2024, only 6% six percent of lawyers received new

grievances. *see* Plaintiff's Exhibit 31 *The Lawyer Regulation System Annual Statistical Report*

*2023-2024* at pg. 11.[31]

Ohio's Board of Professional Conduct data indicates that 8.3% eight-point three percent

of Ohio attorneys received grievances in 2022 while 9.6% of attorneys were grieved in 2023. *see*

Plaintiff's Exhibit 32 *Office of Disciplinary Counsel 2023 Annual Report.*[32]

New grievances, although not conclusive, are one indicator of an attorney's ability to

competently, honestly, ethically, and tenaciously practice law. Taking into account Wisconsin's

grievances data, a state that does not require the UBE exam, compared to Ohio's grievances data,

---

[30] *Available* at https://www.wicourts.gov/courts/offices/docs/olr2024fiscal.pdf
[31] *Available* at https://www.wicourts.gov/courts/offices/docs/olr2023fiscal.pdf
[32] *Available* at ccic

**Verified**                                           23

a state that requires a 270 UBE score, these statistics tend to suggest that UBE passage is not an indicator of an attorney's ability to competently perform.

Arizona's Chief Justice, Ann A. Scott Timmer[33], has also recently agreed with the notion that rigid Bar testing standards are incapable of delineating predictive entry-level job performance. *see* Plaintiff's Exhibit 25 *Addressing the Access-to-Justice Gap: A persistent Challenge That Calls for Multiple Approaches.* Fall 2024 (Vol. 93, No. 3), pp. 6–19.[34] In a recent article published in "The Bar Examiner" the Arizona Chief Justice agreed with the indication that "no one magical passing score exists to differentiate a qualified candidate from an unqualified one." *Id.*

A sworn affidavit has also been submitted with this *Motion* that contains the opinions of a licensed Ohio attorney who has taken Ohio's UBE and concludes that the exam is not a necessary licensing tool. *see* Plaintiff's Exhibit 33 *Sworn Affidavit.*

Plaintiff understands that validation studies may be offered as a defense to Plaintiff's claim. But as the court points out in *Albemarle Paper Co.*, validation studies are 'entitled deference. Any presumption or assertion of "job relatedness" is rebuttable.

To this end, Plaintiff would highlight the concessions made by two NCBE experts who gave a presentation to the organization in 2017. *see* Plaintiff's Exhibit 34 *The Testing Column: Testing Basics: What You Cannot Afford Not to Know.*[35]

---

[33] Ann A. Scott Timmer *Bio available* at https://www.azcourts.gov/meetthejustices/Chief-Justice-Ann-A-Scott-Timmer
[34] *Available* at https://thebarexaminer.ncbex.org/article/fall-2024/addressing-the-access-to-justice-gap/
[35] *Available* at https://thebarexaminer.ncbex.org/article/september-2017/the-testing-column-testing-basics-what-you-cannot-afford-not-to-know-2/

**Verified**                    24

In their presentation, Joanne E. Kane, Ph.D., and Andrew A. Mroch, Ph.D. expressed the idea that the "bar exam cannot realistically assess *all* the knowledge, skills, and abilities needed for entry-level legal practice." *Id* at ¶1.

Plaintiff further understands that the written portions of this licensing exam is scored based on the subjective opinion of individual Bar Graders. As the court points out in *Watson*, an employer's burden of justifying an employment practice is not lessened simply because the practice relies upon subjective assessments.

Taken in the aggregate, this court should rule that Plaintiff has offered evidence which indicates that a Candidate's success on the UBE is not an indicator of a test taker's competence to practice entry-level law or the ability to perform as an attorney.

Therefore, this court should rule in Plaintiff's favor on the issue of job-relatedness.

**c. Alternative Bar admission standards exist that are less discriminatory.**

If an employer meets the "job relatedness" burden, a Plaintiff's Title VII claim may still succeed by showing that the employer refuses to adopt an available alternative practice that has less disparate impact and serves the employer's legitimate needs. *Ricci* at 578.

In the present case, the court should conclude that the Defendants have failed to adopt available less discriminatory alternatives because alternative practices exist in evaluating a Bar Candidate's competence and admitting Candidates to the Ohio Bar, and Ohio has refused to adopt these alternatives.

Wisconsin's licensing standards are "a priori"/ "facially" less discriminatory than Ohio's current practice. In evaluating a Candidate's ability to practice entry-level law, Wisconsin has determined that a Candidate "who has been awarded a first professional degree in law from a law school in this state that is fully, not provisionally, approved by the American bar association shall

satisfy the legal competence requirement." *see* Plaintiff's Exhibit 23 *SCR Chapter 40 Admission to the Bar*.

Wisconsin's approach eliminates all hints of discrimination. This approach removes all artificial post-J.D. testing barriers in the licensing process and permits a Candidate's competence to be evaluated by licensed attorney educators throughout a J.D. candidate's legal education.

Universities employ law professors for the specific purpose of educating and evaluating J.D. candidates' competence and ability to grasp entry-level legal fundamentals. Law professors often possess practical real-world experience, in a particular area of law, and their teaching credentials, in most cases, have been vetted by their university employer before gaining employment.

Plaintiff submits that this court should conclude that J.D. law professors are better equipped and positioned to evaluate Bar Candidate's entry-level performance ability, over a 2 two-day test graded by individuals who have never met or interacted with the Bar Candidate.

This two-day UBE test requires hopeful practitioners to operate under the enormous stress of failure and the extreme pressures of providing pre-determined written legal conclusion to canned legal prompts in less than 30 thirty and 90 ninety minutes. Not all attorneys see or handle legal issues in the same way.

The test also requires Candidates to decipher robust legal multiple-choice questions in under two minutes.

As expressed above, Arizona has developed a different licensing approach that also alleviates discrimination. The Arizona Supreme Court recently unveiled the Arizona Lawyer Apprentice Program (ALAP) in 2024. The ALAP creates an alternative pathway to bar licensing that allows candidates/applicants whose UBE score lands between 260 and 269 to practice law

under the supervision of a qualified Arizona attorney. *see* Plaintiff's Exhibit 25 *Addressing the Access-to-Justice Gap*: *A persistent Challenge That Calls for Multiple Approaches*. Fall 2024 (Vol. 93, No. 3), pp. 6–19.

Upon successful completion of a two-year period, ALAP practitioners are fully admitted to practice law in Arizona without having to retake the bar exam. *Id*.

Oregon has also developed an alternative path for licensing. Titled the Supervised Practice Portfolio Examination, Oregon Bar Candidates are afforded the option to gain a license after the Candidate graduates from an ABA-accredited school, works 675 hours supervised by an attorney, passes the MPRE, leads 2 client interviews, and submits 8 writing samples for review. No formal Bar Exam is required.

Both Oregon's and Arizona's approaches provide an alternative to Wisconsin's approach that alleviates any lingering concerns regarding a Candidate's retained legal knowledge throughout a J.D. education.

And while Arizona has created an alternative path for Candidates whose UBE score lands between 260 and 269, other state jurisdictions have simply elected to lower the UBE score threshold for licensing. *see* Plaintiff's Exhibit 24 *UBE Exam Score Range*.

Connecticut, the District of Columbia, Illinois, Iowa, Kansas, Kentucky, Maryland, Montana, New Jersey, New York, South Carolina, Virgin Islands, and Washington all require that candidates only achieve a 266 UBE score for Bar licensing, while several other states require a 260.

Each of the above-listed approaches presents alternative practices that are more inclusive and less discriminatory than Ohio's approach. While the UBE threshold for measuring a Candidate's competence is lower in several states, Ohio remains one of a minority of

jurisdictions that measure a candidate's/applicant's entry-level legal competence solely on achieving a 270 UBE score, with no alternatives to gain employment as a licensed attorney.

In light of the aforementioned evidence, Plaintiff prays that this Court grants the requested Title VII relief, solely upon a condition that Ohio has failed to adopt alternative, less discriminatory practices, despite the production of any validation studies offered as a defense.

The aforementioned alternative practices have served Wisconsin's and Arizona's needs to admit competent attorneys, and there is no indication that these alternative approaches would not serve the Supreme Court of Ohio Defendants needs to admit competent attorneys to Ohio's Bar.

## B. TITLE VI CLAIM

The Sixth Circuit has "assume[d] without deciding that [the *McDonnell Douglas*] burden-shifting framework governs . . . Title VI claims." *Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006) (citing *Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 508 (6th Cir. 2003); *Gazarov ex rel. Gazarov v. Diocese of Erie*, 80 F. App'x 202, 204-05 (3d Cir. 2003); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998)).

"To establish a prima facie case under *McDonnell Douglas*, Plaintiffs must show that similarly situated members of the nonprotected class received more favorable treatment than they received." *Id.* (citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004); *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 731 (6th Cir. 2004)).

Section 601 of Title VI provides that no person shall, "on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" 42 U.S.C. § 2000d.

The term "program or activity" and the term "program" mean all the operations of--. *Civil Rights Restoration Act of 1987*, Pub.L. 100-259, 102 Stat. 28 (1988).

In *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that private individuals may sue to enforce Title VI. Congress has since ratified that holding: § 1003 of the Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d-7, expressly abrogates states' sovereign immunity against suits brought in federal court to enforce Title VI.

To show intentional discrimination for a Title VI claim, a plaintiff may rely on direct or circumstantial evidence. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 580-81 (6th Cir. 1992).

The Supreme Court has also acknowledged that statistics showing racial or ethnic imbalance are probative in a case such as this one only because such imbalance is often a telltale sign of purposeful discrimination; absent explanation... *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 1856 52 L.Ed.2d 396 (1977).

[A] plaintiff may also demonstrate [a] defendant's deliberate indifference to discrimination from a defendant's actions or inaction in light of known circumstances. *Williams v. Port Huron Sch. Dist.*, 455 Fed.Appx. 612, 618 (6th Cir.2012) *(citing Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 141 (2d Cir.1999)).

In the present case, this court should conclude that the Defendants have engaged in intentional discrimination and or remain deliberately indifferent to the racial discrimination engendered by current Rule I Section 1(E) licensing standards, as prohibited under Title VI, for many reasons that parallel Plaintiff's Title VII argument.

Notwithstanding the contents of Plaintiff's Title VII argument, the Supreme Court of Ohio Defendants' deliberate indifference to the racial discrimination engendered by Rule I

Section 1(E) is distinguished in their reaction to the findings of the Ohio Commission on Racial Fairness (OCRF) and the Racial Fairness Implementation Task Force (RFITF).

The Supreme Court of Ohio Defendants have acknowledged the existence of racial bias and discrimination in Ohio's legal system as early as 1993.

Presumably, the Supreme Court of Ohio Defendants' acknowledgement of such discrimination extended to the racial makeup of Ohio's bench and bar.

As a result of this acknowledgement, in 1993, the Supreme Court of Ohio tasked the OCRF with formally identifying "racial bias" in Ohio's legal system with the intent to "propose methods for eliminating it from the legal profession and the justice system."

For six years, the Supreme Court of Ohio's OCRF analyzed racial bias in Ohio's legal system, at the taxpayers' expense.

The OCRF ultimately found that the lack of African American and minority lawyers in Ohio was a "disturbing trend" that needed to be addressed in order to curb the trend of perceived and actual racial inequity in Ohio's legal system.

Upon the release of the OCRF's findings, the Supreme Court of Ohio commissioned an additional task force, the RFITF, to implement OCRF's findings.

In 2000 the Supreme Court of Ohio commissioned the Racial Fairness Implementation Task Force (RFITF). This Task Force spent an additional two years studying the OCRF's findings, developing practical approaches to implement OCRF's findings, and creating additional recommendations that would have the effect of eliminating racial bias in Ohio's legal system.

As outlined above, both the OCRF and RFITF conceded that one component of combating racial bias and discrimination in Ohio's legal system was addressing the "lack of minority representation on the bench and bar."

**Verified**                                    30

As a result of its two-year study, the RFITF insisted that the Supreme Court of Ohio Defendants collect and monitor bar exam results for race-based discrepancies.

After nearly 8 eight years of grappling with the issue of racial bias in Ohio's legal system, particularly as it relates to the employment and access to African American attorneys as outlined in this claim, the Supreme Court of Ohio Defendants ignored both the OCRF's and RFITF's insistence for the need to increase minority representation on the bench and bar, in part, by failing to collect and monitor bar exam results for race-based discrepancies.

The Supreme Court of Ohio Defendants' failure to adhere to this recommendations is not only evidenced in its 2017 Task Force on the Ohio Bar Examination Report, which failed to study the extent to which the UBE would cause disparate impact on African Americans in the manner that it studied "gender-related" disparate impact caused by the UBE, there is also no indication that the Supreme Court of Ohio Defendants subsequently monitored or made any adjustments for disparate impact caused by the UBE or Rule I Section 1(E) licensing standards since administering the licensing exam in 2020.

This as well as other failures, have led to the continual underrepresentation of African American attorneys on the bar and bench and there continues to be a disproportionate number of otherwise competent African Americans excluded from the practice of Ohio law.

The NCBE Defendants' failure to adjust for the disparate impact caused by the UBE is evidenced in its actions since gaining knowledge of racial disparities caused by the UBE exam through its participation in a New York State impact study in 2017. *see* Plaintiff's Exhibit 34 *NY UBE Adoption Part 1 Executive Summary* at pg. 4-5.[36]

---

[36] *Available* at
https://www.nybarexam.org/UBEReport/NY%20UBE%20Adoption%20Part%201%20Executive%20Summary.pdf

New York State's UBE impact study was conducted by the New York Supreme Court in conjunction with the NCBE and indicates that Black/African American UBE test takers were disproportionately impacted by the exam, particularly in overall scores and on the written portion of the exam, at higher numbers than their white counterparts. *Id* at pg. 4.

The NCBE, and the Supreme Court of Ohio Defendants have ignored these collective statistics and recommendations and have moved forward with administering the UBE, in the face of systematic negative effects on African American Bar Candidates, since 2017 and 2020 respectively.

Plaintiff submits that the Defendants' conduct amounts to intentional discrimination and or deliberate indifference to the rights of African American Bar Candidates in light of ubiquitous commitments, recommendations, and pledges to increase the opportunities of licensing and employment of African American seeking to become licensed attorneys in Ohio as well as nationally.

Therefore, Plaintiff prays that the court concludes that the Defendants have engaged in intentional discrimination and or remain deliberately indifferent to the racial discrimination engendered by the UBE and current Rule I Section 1(E) licensing standards, and grant Plaintiff's requested Title VI relief.

## C. DUE PROCESS CLAIM & EQUAL PROTECTION CLAIM

In order to successfully claim that a state action has deprived an individual of due process of law, a plaintiff must establish a liberty or property interest that the state has denied. *Board of Regents v. Roth,* 408 U.S. 564, 569, 570, 571, 92 S.Ct. 2701, 2705, 2706, 33 L.Ed.2d 548 (1972). The Fourteenth Amendment declares that no State shall deprive any person of life,

**Verified**                                              32

liberty, or property without due process of law. *Dent v. West Virginia*, 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).

Due Process undoubtedly secures the right of every citizen to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition. *Id* at 221.

States cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause. *Schware v. Board of Bar Examiners of the State of New Mexico*, 64 A.L.R.2d 288, 1 L.Ed.2d 796, 77 S.Ct. 752, 353 U.S. 232 239.

Although states may require high standards of qualification, such as proficiency in its law, any qualification must have a rational connection with the applicant's fitness or capacity to practice law. *Douglas v. Noble*, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590; *Cummings v. State of Missouri*, 4 Wall. 277, 319—320, 18 L.Ed. 356. States cannot exclude an applicant when there is no basis for their finding that the Plaintiff fails to meet these standards, or when their action is invidiously discriminatory. *Schware* at 239.

If mandated qualifications have no relation to such calling or profession, or are unattainable by such reasonable study and application, they can operate to deprive one of his right to pursue a lawful vocation. *Dent* at 122. Mandated professional qualifications are appropriate only when they are attainable by reasonable study or application. *Id*.

Here, Rule I Section 1(E) violates the Due Process and Equal Protection Clause because the Rule contains licensing standards that are arbitrary, the arbitrary nature of the licensing standard leads to the reasonable conclusion that the Rule has no rational connection with an applicant's fitness or capacity to practice entry-level law, the Rule as applied is discriminatory, the Rule's

**Verified** 33

standards are unattainable through reasonable study for a significate majority of African American test takers, the Rule's standards are not equally applied to out-of-state attorneys who have failed to achieve a 270 UBE test score, and the Supreme Court of Ohio Defendants adopted the standards without regard for the exams' disparate impact on African Americans while ensuring to ameliorate "gender-related" disparate impact caused by the exam.

The Supreme Court of Ohio Defendants equate a Bar Candidate's competencies to practice entry-level Ohio law with achieving a 270 UBE score. As outlined above, evidence suggests that there is no indication that achieving a 270 UBE should be the cut-off for determining the competence of qualified candidates as outlined in *Washington v. Davis,* 426 U.S. 229, 247, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Supreme Court of Ohio Defendants have also failed to produce validity studies indicating the necessity of their selection of a 270 minimum competence score.

To that end, the NCBE, not Ohio, writes and develops the UBE licensing exam. The exam is virtually identical across jurisdictions and several jurisdictions have selected a lower minimum competence UBE licensing standard.

The Supreme Court of Ohio Defendants have failed to identify a consistent means by which Bar Candidates may achieve a 270 UBE score under their grading standards. The Defendants offer no grading rubric and based on all available evidence, it appears that a Bar Candidate's ability to produce the correct response to pre-determined legal conclusions on the written portion of Ohio's UBE, often happens by mere chance.

ABA data indicates that in 2022, 43% forty-three percent of first-time African American UBE takers failed the exam. Over the past 4 years, on average, 39.5% thirty-nine-point five percent of first-time African American Bar Candidates fail the exam.

**Verified**                                  34

These statistics indicate that for a significant portion of first-time African American UBE test takers, a passing UBE score is unattainable by such reasonable study and application.

As expressed in Plaintiff's Title VII argument, the Supreme Court of Ohio Defendants adopted its current licensing standards without regard for the exams' disparate impact on African Americans. Through extensive study, the Defendants did however to ensure the exam engendered less "gender-related" disparate impact. *see* Plaintiff's Exhibit 17 *Task Force on the Ohio Bar Examination* at 13.

The 2017 Task Force on the Ohio Bar Examination indicates that the Defendants extensively studied the "gender-related" disparate impact caused by the UBE. *Id* at 10. However, the Tasks Force **did not** study the extent to which the UBE would cause disparate impact on African Americans in the manner it studied "gender-related" disparate impact caused by the UBE. *Id* at 15.

Plaintiff untimely submits that Rule I Section 1(E) violates the Due Process and Equal Protection Clause because no reasonable alternative exists to gain employment as a licensed Ohio attorney if a Candidate fails to achieve a 270 UBE score.

Therefore, this court should conclude that the Plaintiff has established that Rule I Section 1(E) violates the Due Process and Equal Protection Clause and grant Plaintiff's requested relief.

## MOVANT WOULD SUFFER IRREPARABLE INJURY

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir.2007).

**Verified**                    35

When constitutional rights are threatened or impaired, irreparable injury is presumed. *See ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir.2003) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

There is likewise a presumption of an irreparable injury when a plaintiff has shown a "violat[ion] [of] a civil rights statute." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir.2001).

Here, in addition to having a high likelihood of success on the merits, Plaintiff has suffered and will continue to suffer immediate, irreparable harm unless she receives the requested injunctive relief because Plaintiff's harm is not fully compensable by monetary damages and Plaintiff's constitutional rights will continue to be impaired in the absents of the requested injunctive relief.

Plaintiff's claim, in part, is covered under Title VI, VII of the Civil Rights Act of 1964 and under the Equal Protection and Due Process Clauses of the 14th Amendment.

Plaintiff submits that the humiliation associated with the disparate impact of Rule I Section 1(E) would be extremely hard, if impossible, to quantify through monetary judgment.

Furthermore, the denial of her requested relief would permit the continued deprivation of Civil Rights Law, to Plaintiff as well as others.

For the past year and a half, Plaintiff has suffered the humiliation associated with the disparate impact of Rule I Section 1(E) and this humiliation has caused Plaintiff to suffer increased stress, anxiety, and depression due to the humiliation of failing the meet the standards outlined in Rule I Section 1(E). Failure of this licensing standard will follow Plaintiff forever.

As noted in this *Verified Memorandum* and *Verified Complaint*, Plaintiff has been otherwise qualified to practice Ohio law since May of 2023.

Attorneys build their skills, credibility, and gain access to greater job opportunities through years of practice and daily interactions with judges, clients, court staff, and other legal professionals. For the past year and a half, Rule I Section 1(E) has caused Plaintiff to be shut out from obtaining the aforementioned benefits. Plaintiff will never be able to make up this lost time and will continue to experience this harm unless the requested injunctive relief is granted.

No monetary amount can be awarded to adjust for these losses.

Plaintiff also suffers from medical conditions that require monthly doctor visits and monthly medication. As a result of Plaintiff's inability to gain full employment, she lacks access to the necessary healthcare and is incapable of affording her monthly medication.

Therefore, this court should rule that Plaintiff's harm is irreparable and irremediable by monetary damages at law and that her rights can only be protected by declaratory and injunctive relief.

## THE INJUNCTION WILL NOT SUBSTANTIALLY INJURE OTHERS

The third factor for a court to consider is "whether the issuance of the injunction would cause **substantial** harm to others." *Tumblebus Inc. v. Cranmer,* 399 F.3d 754, 760 (6th Cir.2005).

As the court points on in *Entm't Prods., Inc. v. Shelby Cnty*, the last two factors in the injunctive relief framework involve the interests of nonparties, oftentimes, balancing the last two factors against the first two is referred to as "balancing equities." *Entm't Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 395 (6th Cir. 2009).

Here, granting Plaintiff's requested relief will not substantially harm any third party because courts will maintain their ability to litigate cases, the legal system will continue to operate,

**Verified**                    37

and the public will maintain access to the current group of licensed attorneys if this Court rules in Plaintiff's favor.

Plaintiff claim seeks to rectify past, current, and future harm caused by the Defendants' continued use of the UBE and Rule I Section 1(E)'s UBE licensing standards. The Temporary Restraining Order and Preliminary Injunction herein sought would merely pause the administration of the UBE licensing exam while alternative standards are developed for evaluating Bar Candidates' competence and or alternative licensing standards are developed that prove to be less discriminatory.

Applying a "balancing equities" analysis, any harm caused to a third party would be outweighed by the public's interest in obtaining increased access to a racially diverse Bar that includes a greater number of members who "share experiences, perspectives, languages," and who better understanding minority client's circumstances and goals as outlined in Associate Judge Phyllis D. Thompson's article. *see* Plaintiff's Exhibit 15 *Focus on Diversity: Why Diversity Must Matter to the Bar Admission Community*.

An argument could be made that granting Plaintiff's requested relief would negatively affect current Bar Candidates who seek to take the upcoming licensing exam.

Plaintiff submits that she is similarly situated and is also seeking licensing under the current challenged Rule. Any inconvenience experienced by those who seek to take the upcoming licensing exam has been experienced by countless other African Americans Candidates who have unsuccessful sought licensing under the current standards.

Plaintiff submits that now is as good as any other time to ensure that all Candidates have access to fair and equal opportunities to gain licensing and ultimately employment as licensed attorneys.

**Verified** 38

As outlined in the subsequent "Public Interest" section and above, the public has an overwhelming interest in accessing a diverse group of competent attorneys which includes otherwise competent African American attorneys.

Furthermore, current Bar Candidates have an interest in participating in a licensing process that is fair, equal, free of disparate impact, and constitutionally sound.

Therefore, this court should hold that any harm experienced by a third party is sustainably outweighed by the public interest.

### THE INJUNCTION FURTHERS THE PUBLIC INTEREST

The Sixth Circuit has concluded that "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.1994).

Here, the court should find that the public interest is served because the public, as well as the legal system, has an overwhelming interest in having access to a diverse group of competent attorney practitioners, which includes otherwise competent African American attorneys, in keeping with statistical averages.

Plaintiff's claim intends to ensure that the public has access to competent African American as provided for under Title VI, VII of the Civil Rights Act, as well as under other Constitutional and state law provisions.

Therefore, the court should rule that the public interest is served by granting Plaintiff's requested relief.

### CONCLUSION

In 2021 the Federal Bar Association's (FBA) proposed a diversity statement that incorporates the FBA's position that: "recognizes diversity as a core value that is fundamental to

the justice system. It is our responsibility and privilege as judges, practitioners, law students, and senior lawyers of the federal bar to ensure that our profession actively includes, provides equal opportunity to, and welcomes participation by all individuals, regardless of sex, race, gender, ethnicity, color, national origin, citizenship status, religion, age, sexual orientation, gender identity and gender expression, disability, military and veteran status, and any other unique attribute." *see* Plaintiff's Exhibit 35 *FBA Diversity Action Plan* at pg. 13.[37]

Plaintiff submits that the FBA's diversity vision will never be realized if the number of African American Bar Applicants continues to be admitted to "State Bars" at the current rate. **Wherefore,** All the required elements for a Temporary Restraining order and Preliminary Injunctive Relief have been met and Plaintiff prays that this Court issue a declaratory judgment indicating that Rule I Section 1(E) of the Supreme Court of Ohio's Rules for the Government of the Bar of Ohio, as applied to the general requirements for Ohio Bar admission, are unconstitutional.

Plaintiff further prays that this Court expeditiously grant the requested Temporary Restraining Order followed by Injunctive Relief against the Supreme of Ohio Court Defendants pausing the administration of Ohio's UBE Bar Exam as provided for in Rule I Section 1(E), and issue a declaratory judgment ordering the Supreme Court of Ohio to immediately admit Plaintiff to the Ohio Bar.

Respectfully submitted,

JOHN DOE

/s/

John Doe *Pro-Se Plaintiff*
6908 Willow Bloom Dr.
Canal Winchester, OH, 43110
Phone: 216-525-9982
Email: dbsmith135@gmail.co

Dated: July 11, 2025,

---

[37] *Available* at https://www.fedbar.org/wp-content/uploads/2021/05/FBA_DiversityActionPlan-2021.pdf

**Verified**                    40

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Motion* was filed with the Clerk of

Court and notice of this filing has been sent to all parties in this manner, or by U.S. mail, or

electronic mail.

Respectfully submitted,

JOHN DOE

/s/

John Doe *Pro-Se Plaintiff*
6908 Willow Bloom Dr.
Canal Winchester, OH, 43110
Phone: 216-525-9982
Email: dbsmith135@gmail.com

Dated: July 11, 2025

**RICHARD SCHUSTER, CHIEF LEGAL OFFICER THE OHIO SUPREME COURT**
65 SOUTH FRONT ST.,
COLUMBUS, OHIO, 43215
614-387-9404

**THE OHIO BOARD OF LAW EXAMINERS**
65 SOUTH FRONT ST., 5TH FLOOR
COLUMBUS, OHIO, 43215
614-387-9340

**NATIONAL CONFERENCE OF BAR EXAMINERS**
302 S. BEDFORD ST.,
MADISON, WISCONSIN, 53703

**Verified**                    41

## Verification

I John Doe, declare as follows:

1. I am the Plaintiff in the present case, and I am a citizen of the United States of America. I am an Ohio Bar Candidate and am otherwise qualified to be admitted to the Ohio Bar.

2. I have personal knowledge of myself, my activities, and my intention, including those set out in the foregoing *Motion for Temporary Restraining Order and or Preliminary Injunction* and the *Verified Complaint for Declaratory and Injunctive Relief*, and if called on to testify I would completely testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the *Verified Complaint for Declaratory and Injunctive Relief* and the accompanying *Motion for Temporary Restraining Order and or Preliminary Injunction* concerning myself, my activities, and intentions are true and correct as best researched and recollected. 28 U.S.C. §1746.

Executed on _11 July_, 2025

/s/

John Doe Plaintiff